## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **FRANKLYN WILLIAMS,** | ) |
| Plaintiff, | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **PRISONER TRANSPORTATION SERVICES, LLC,** | ) |
| 517 Hickory Hills Blvd. | ) |
| Whites Creek, Tennessee 37189 | ) |
| and | ) |
| | ) Docket No.: |
| **PRISONER TRANSPORATION SERVICES** | ) |
| **OF AMERICA, LLC,** | ) |
| 517 Hickory Hills Blvd. | ) |
| Whites Creek, Tennessee 37189 | ) |
| and | ) |
| | ) |
| **BREVARD EXTRADITIONS, LLC,** d/b/a | ) |
| **U.S. PRISONER TRANSPORT, INC.** | ) JURY TRIAL DEMANDED |
| Serve on Resident Agent: Lisa Kyle | ) |
| 4150 Dow Road, Suite #1 | ) |
| Melbourne, Florida 32934 | ) |
| and | ) |
| | ) |
| **"SERGEANT" MICHAEL GUERRA,** | ) |
| c/o PTS of America, LLC | ) |
| and | ) |
| | ) |
| **CUYAHOGA COUNTY, OHIO** | ) |
| Defendants. | ) |

## COMPLAINT FOR DAMAGES

**COMES NOW**, Plaintiff Franklyn Williams, by and through counsel, files this Complaint

against the Defendants Prisoner Transportation Services of America, LLC, Brevard Extraditions,

LLC, d/b/a U.S. Prisoner Transport, Inc., and parent company Prisoner Transportation Services

LLC, (collectively, the"PTS Defendants"), "Sergeant" Michael Guerra, and Cuyahoga County,

1

Ohio, for violation of the Fourteenth Amendment to the United States Constitution, *see* 42 U.S.C. § 1983; negligence; battery, and intentional infliction of emotional distress.

## PARTIES

1.      Plaintiff Franklyn Williams resides in Cleveland, Ohio. From on or about July 15, 2018 to July 20, 2018, Mr. Williams was an inmate in the custody of Defendant PTS. He currently is in custody at Cuyahoga County Jail in Cleveland, Ohio.

2.      Defendant Prisoner Transportation Services of America, LLC, is a limited liability company with a principal place of business in Whites Creek, Tennessee. PTSA contracts with state and local governments, prison/correctional facilities, and law enforcement agencies nationwide to transport arrestees and incarcerated prisoners across jurisdictional lines.

3.      Defendant Brevard Extraditions, LLC d/b/a/ U.S. Prisoner Transport, is a for-profit corporation with its principal place of business in Melbourne, Florida. USPT provides prisoner transportation and extradition services in the United States for state and local governments and government agencies. On information and belief, USPT routinely conducts business in Tennessee.

4.      Both USPT and PTSA are wholly operating subsidiaries of Prisoner Transportation Services, LLC, a limited liability company with a principal place of business in Whites Creek, Tennessee, just outside Nashville. Prisoner Transportation Services, LLC, acquired USPT and PTSA on or around June 2015. Upon information and belief, the combined entity is the largest for-profit extradition company in the U.S. Following the acquisition, Prisoner Transportation Services, LLC, assumed common control and management of USPT and PTSA. While USPT and PTSA continue to offer the same services they offered prior to the acquisition, the functions and activities of these two companies were, and remain, consolidated as a result of the acquisition.

5.    On information and belief, because the activities and operations of USPT and PTSA are consolidated, the companies have the same management, training protocols, policies, practices, and manner of conducting their businesses. Prisoner Transportation Services, LLC owns and has complete operating control over USPT and PTSA and adopted, approved, or ratified the policies, practices, and customs at issue in this Complaint. Prisoner Transportation Services, LLC, USPT, and PTSA operate as a single entity. They share employees, equipment, and facilities, and—as a group—contract with states, and municipalities for the transport of prisoners.

6.    Defendant Cuyahoga County is a municipality located in Ohio. Upon information and belief, since 2007, Cuyahoga County has contracted with PTS and/or USPT for the provision of extradition and prisoner transport services traditionally provided by local law enforcement.

7.    At all times material hereto, Defendant Michael Guerra is a resident of the United States and was employed by the PTS Defendants. Guerra was a driver and/or security guard in a supervisory position who transported Mr. Williams and subjected him to abusive treatment and effectuated the policies and procedures of the PTS Defendants at issue in this Complaint.

8.    In acting or omitting to act as alleged herein, the PTS Defendants acted through their employees or agents, including Defendant Michael Guerra and are responsible for the acts and omissions of these employees or agents within the scope of their employment or agency.  In acting or omitting to act as alleged herein, each employee or officer of PTS, including Defendant Guerra, was acting within the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employer or officer as agent, including Defendant Guerra, were subsequently ratified and adopted by the PTS Defendants as principal.

3

9.     The service the PTS Defendants provides, namely, extradition and transportation of arrestees and incarcerated prisoners, has traditionally been performed exclusively by the State. At all times relevant hereto, the PTS Defendants were state actors, acting under color of state law.

## VENUE AND JURISDICTION

10.     This Court has original jurisdiction over Plaintiff's claims arising out of the United States Constitution and 42 U.S.C. § 1983 by virtue of 28 U.S.C. §§ 1331 and 1343.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c)(2). Prisoner Transportation Services, LLC, has its principal place of business in Whites Creek, Tennessee. Cuyahoga County is an entity subject to the personal jurisdiction of this court via its contractual relationship with the PTS Defendants. Upon information and belief, Defendant Guerra is a resident of Tennessee. Alternatively, Venue is proper under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim—to wit, the PTS Defendants' unlawful policies and procedures—occurred in Tennessee, where Prisoner Transportation Services has its headquarters.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Plaintiff is entitled to reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988.

## GENERAL FACTUAL ALLEGATIONS

### INTRODUCTION

14.     Over the course of a 5-day transport from Omaha, Nebraska to Cleveland, Ohio, Defendants subjected Mr. Williams to extreme and inhumane conditions that violated all standards of decency. Defendants shackled Williams in chains that were so tight his ankles and wrists became painfully swollen and discolored, and crammed him in the back of an unventilated, foul-smelling

4

transport bus packed with other transportees. Williams was restrained for 89 straight hours and placed inside a cage during the bulk of that time; he was only allowed out of the cage on very few occasions to stand up/sit down or walk around. Mr. Williams was only allowed to make infrequent breaks to the onboard bathroom, which was in disrepair / an insanitary condition and shared with a passenger known to have a contagious staph infection. Many transportees, Williams included, were forced to relieve themselves in their seats. For four days, Williams was not permitted to attend to his most basic hygienic needs; he could only attempt to sleep while sitting upright on a hard bench. Williams spent the duration of the transport sitting in human waste and filth, enduring the overwhelming heat and stench onboard the bus, and was mocked, verbally and physically assaulted the individuals employed by PTS as drivers or guards. Williams was also denied medical treatment for serious injuries caused by those PTS employees, to wit—pepper spray maliciously sprayed in his face and eyes and painful swelling in his ankles and wrists from overly tight restraints. Williams arrived in Ohio traumatized and in pain.

15. Williams' experience in the PTS Defendants' custody is not unique, but rather the predictable result of PTS/USPT's customs, policies, and practices that dictate the how they conduct their business. Among other things, PTS/USPT prioritizes maximizing profits by transporting as many detainees as possible, with as few stops for rest or care possible, over its obligation to safely transport those in its custody. These policies and/or customs create grossly unsafe, unsanitary, and inhumane conditions of confinement for the individuals transported by PTS/USPT.

16. On information and belief, PTS/USPT has provided extradition and prison transport services to the Cuyahoga County Sherriff's Office and Cuyahoga County Jail since 2007. The PTS Defendants were thus operating under the delegated authority of Cuyahoga County. Based on the many lawsuits, news reports, and investigations that publicly detailed PTS/USPT's abuses in the

past, Cuyahoga County was aware, or should have been aware, of the grave risk to persons, such as Williams, in its custody. The County was woefully indifferent to the rights of those in its charge.

## PLAINTIFF'S TRANSPORT TO CUYAHOGA COUNTY

17.      On or about July 15, 2018, Plaintiff, Mr. Franklyn Williams, was an inmate in the custody of Douglas County Jail in Omaha, Nebraska. At around 10:00 A.M. on the morning of July 15, Williams was placed on a transport bus operated by the PTS Defendants so he could be transported to Cuyahoga County Jail in Cleveland, Ohio—a distance of 795 miles or twelve (12) hours of driving. However, instead of this transport lasting twelve hours, Williams spent 89 hours (just shy of four days) aboard that PTS transport bus until he arrived in Hamilton County, Indiana, *still 300 mile*s from his destination. It was only after Hamilton County jail officials filed a report against the PTS Defendants that Williams was transported via a direct route to Cleveland.

18.      The PTS employees acting as drivers and/or guards on board the transport bus were Defendant "Sergeant" Michael Guerra, David Ford, Jimmy Jones, Clyde [Last Name Unknown], and one unknown officer. The PTS employees on board would rotate driving duty so that the bus could be driven for prolonged periods, *i.e.*, days on end, including through the night.

19.      When Mr. Williams got onto the PTS transport bus on the morning of July 15, he noted that the bus was packed with people, with some detainees/inmates laying on the floor. The passengers, cuffed and shackled, sat shoulder-to-shoulder on hard metal benches without seatbelts. The smell onboard the bus—of unwashed bodies, urine/feces, vomit and other filth—was terrible. There were approximately twenty-five (**25**) detainees/inmates on board, in addition to the PTS drivers/guards. Although there was a bathroom onboard, the toilet was in disrepair and overflowing with filth, and the detainee/inmate passengers were forced to share a toilet with a passenger whom was known to be suffering from a (contagious) staph infection in his genital region. At times, many

6

of the transportees, like Williams, were unable to use the onboard bathroom and thus were forced to relieve themselves in their seats or into water bottles and plastic bags. The transport bus lacked adequate air conditioning and/or was poorly ventilated. With temperatures reaching the mid-80s to low 90s during the day, the air was stifling.

20.     Williams was placed into leg irons and shackles and directed to sit on a steel bench. He then spoke with another passenger on the bus, Maurice Cartledge. Cartledge informed Williams that he had been handcuffed and shackled on that bus since July 11 without any respite from those restraints, and without being allowed off the bus to shower, stretch his legs, or take care of basic hygienic needs. Cartledge was also bound for Cleveland; despite the fact he started his journey in nearby Kentucky, Cartledge had endured these conditions only to find himself in Omaha four days later. Cartledge told Williams that he tried to complain to the PTS guards on board; however, those guards threatened to pepper spray or tase him if he (Mr. Cartledge) did not sit back down.

21.     Having heard Cartledge's account and seen the conditions on board the bus himself, Williams spoke to the PTS drivers/guards and objected to what he viewed as inhumane treatment.

22.     Defendant Guerra initially placated Mr. Williams, stating he would see if Williams and the others could be put on a different transport bus. Sergeant Guerra then placed Mr. Williams in a caged area at the front of the bus. Officer Jones trained his taser on Williams, despite the fact that Williams was tightly cuffed and shackled, inside a locked cage, and posed no threat. Sergeant Guerra then repeatedly grabbed at the gun on his belt. At this, Williams pointed out that Jones had a taser trained on him, and asked "[w]hat do you plan to do with the gun?" Guerra replied, "I wish that I could shoot you in the head, but I don't feel like doing the paperwork."

23.     Some miles down the road, near Sioux Falls, South Dakota, a trooper with the South Dakota Highway Patrol boarded the bus. Williams again complained of the conditions on the bus

and further reported Guerra's comment about wanting to shoot him in the head. That trooper agreed that the conditions on the bus were not acceptable; however, the trooper said that there was "only so much [he] could do," because Williams had no charges in South Dakota and if he (the trooper) helped Williams, he would have to help the other (25+) detainees on board. The trooper stated he would speak with Guerra's supervisor regarding Guerra's comments and the conditions on the bus.

24.     In the afternoon of July 15, Mr. Williams spoke with Sergeant Guerra's supervisor, Shannon Slade, over speakerphone using a guard's cell phone. Ms. Slade assured Williams that he and the other passengers would be provided different transport. Those assurances were false; the PTS bus drove through the night, with Williams and the others struggling to sleep while sitting upright on the hard metal benches—as many of the passengers had for days on end. Williams and other detainees were offered only infrequent dollar-menu meals, and insufficient water. At times, the PTS driver at the wheel careened down the road at unlawful and dangerous speeds (upwards of 85 miles per hour).

25.     That night, Williams spoke with a woman sitting in the caged area beside him. She told Williams she had been on the bus non-stop since July 11, without any access to running water to attend to her basic hygienic needs. The woman was on her menstrual cycle and had been forced to sit in her own blood for days. Over the next few days, until she disembarked on July 19, Williams heard that same woman cry nonstop due to the swelling and pain in her ankles from the shackles.

26.     On July 16, 2018, the PTS transport bus stopped at a County Jail in Minnesota to pick up still more passengers. Mr. Williams again spoke out about the conditions on board the bus. In response, Sergeant Guerra, and Officers Jones and Clyde [LNU], used duct tape to affix trash bags to the sides of Williams's cage. Guerra opened a small hole in the plastic and sprayed pepper spray into Williams's face, and told Williams to "sit in that [expletive]."

8

27.     Sit in it, he did. For the next two days, Williams sat on a hard bench inside a cage, his eyes, nose, and skin burning from the pepper spray that he could not wash off. When Williams tried to rest with his head on his arms—sweating from the mid-July heat—the pepper spray would "re-activate" and more acutely burn his face and eyes.

28.     Mr. Williams repeatedly asked for medical care and was denied. Around 5:00 P.M. on July 18, 2018, Sergeant Guerra told Mr. Williams that the drivers/guards on board had almost reached the maximum allowable driving time pursuant to federal regulations. If Mr. Williams was taken to the hospital for treatment, Guerra said, Mr. Williams and the other passengers would be forced to sit on the side of the road for two days in the July heat, without food or water, until the PTS drivers could drive again. It was suggested or intimated that other detainees/inmates onboard might retaliate against Williams for the delay. Mr. Williams was thus pressured into retracting his demand for much-needed medical care.

29.     At around 3:00 A.M. on July 19, the transport bus made it to Hamilton County Jail in Noblesville, Indiana. After almost four days, Williams's handcuffs and shackles were removed and he was permitted to shower and rest. His wrists and ankles were painfully swollen due to these restraints and he was stiff and barely able to walk after sitting upright for days on end.

30.     Williams immediately reported the deplorable treatment and inhumane conditions on the PTS bus to Hamilton County jail officials. Those officials filed a report on Mr. Williams's behalf, took pictures of his injuries, and placed Mr. Williams into their custody as a "keep safe" inmate. At the demand of jail officials, on July 20, Williams was placed in a different PTS transport van and taken directly to Cuyahoga County Jail. He arrived approximately six hours later.

31.     As a result of this ordeal, Williams endured great pain from being tightly restrained for days on end. When he arrived in Hamilton County, his ankles and wrists were visibly swollen,

9

his skin was discolored and chafed, lacerated, and rubbed raw. He was dehydrated and overheated. He spent two full days covered in pepper spray; the associated pain and discomfort did not abate until he sometime after he was finally allowed to shower. Williams has also experienced ongoing emotional pain; he suffers from anxiety, feelings of humiliation, depression, etc.

## THE PTS DEFENDANTS' POLICIES AND PRACTICES

32.     While state and local law enforcement agencies have traditionally been responsible for the extradition and out-of-state transport of arrestees and/or prisoners, increasingly states and municipalities are outsourcing these functions to private prisoner transportation companies like the PTS Defendants. The PTS Defendants represent that their services cost a fraction of what it would cost a state or local government to transport its own prisoners, mainly by conserving the resources associated with having local officials accomplish these extraditions. The PTS Defendants tell law enforcement agencies: "we can move your prisoner at less cost than if you did it yourself." *See* https://prisonertransport.net/index.html (last accessed July 9, 2019).

33.     The PTS Defendants charge per prisoner, per mile (calculated based upon distance between the pickup and drop off point). To maximize the amount of money the PTS Defendants can make along any given route of travel, the PTS Defendants schedule their drivers to do as many pickups as are requested, without regard for where detainees are ultimately to be dropped off. PTS transport vans and buses take long, circuitous routes—often traveling back to a state that they were in days prior to pick up additional prisoners—before dropping off any detainees at their ultimate destinations. As a result, it is common for the PTS Defendants' detainees to be on the road, locked in their transport vehicles, for weeks at a time.

34.     The PTS Defendants' drivers rotate during any given transport so that the vehicles do not have to stop for prolonged periods of time to allow drivers to rest. Occasionally, but rarely,

10

the PTS Defendants make arrangements with local jails that agree to house detainees overnight at some points during the course of transport. Save for these rare instances, detainees spend close to the entire length of the transport in the back of PTS' "mobile jails." Yet these "mobile jails" lack the basic necessities and sanitary conditions (to ensure human decency) detainees would expect to find while being housed in a local jail or correctional facility.

35.    The PTS Defendants' mobile jails are most often vans and transport buses outfitted with steel interior cages, in which detainees are locked; metal benches that run the length of the back passenger compartment, on which detainees sit; and a metal divide between the two benches. In line with their practice of picking up as many detainees as they can for transport, PTS drivers and guards cram detainees shoulder-to-shoulder in their cages, sometimes exceeding the maximum capacity of their vehicles.

36.    PTS transport vans and buses usually do not have seatbelts or safety restraints for the individuals that they are transporting. Many PTS transport vehicles do not have toilets; if they do, those toilets are often in poor working order. As a matter of policy, PTS does not provide for regular bathroom breaks for individuals they are transporting so as to maximize the amount of time their transport vehicles are on the road. As a result, detainees are forced to urinate into empty cups and bottles; the PTS Defendants have admitted as much in court. *See* No. 5:18-cv-00070 (W.D. Va.) (Defendants' Answer filed June 19, 2018).

37.    The PTS Defendants' cages are not regularly cleaned along the transport route and, as a result, detainees are routinely forced to sit in human waste—their own or that of others—for the entire time that they are in transport. Individuals in the PTS Defendants' custody are generally not permitted to shower, brush their teeth, change their clothes, or perform any basic hygiene tasks, sometimes for a period of weeks.

38.     For the entire time the detainees are in PTS custody, they are tightly shackled at the wrist, waist, and ankles. Because the PTS Defendants do not provide for regular stops or breaks during transport, those in transport are not permitted to regularly walk or stretch while on the road. Instead, the PTS Defendants require the individuals that they transport to remain cramped in the back of the PTS Defendants' transport vehicles for the duration of the trip. Transportees are often placed in excessively tight restraints, causing great pain and discomfort.

39.     The business model of the PTS Defendants is to have prisoners sleep sitting up in its transport buses/vans, with a soft "goal" of locating a facility for overnight rest every 36 to 48 hours. Given the challenges in sleeping sitting up—on hard, narrow benches, in handcuffs and leg shackles, without seatbelts, and in close proximity to other transportees—this business model is, in actuality, to have its transportees go days without adequate sleep, which violates constitutional rights of pretrial detainees such as Williams to be free from cruel and unusual punishment. The other conditions aboard Williams' transport bus—the heat, poor ventilation, and the overwhelming stench—made sleeping impossible.

40.     There is little ventilation in the back of PTS transport vehicles. In warmer months, the temperature can reach extreme levels that create a significant risk of heat stroke or heat-related illness to the individuals that the PTS Defendants transport. Yet, the PTS Defendants' policies and practices do not provide for regular checks or procedures to ensure that temperatures remain at a safe level or that the overall conditions in the back of the PTS Defendants' transport vans are safe.

41.     Because the PTS Defendants' policies and practices do not provide for regular stops along the course of the transport to attend to the individuals being transported, drivers do not take breaks necessary to provide detainees with adequate food and water. The drivers and employees accompanying the transport provide detainees with cheap fast food and water is severely rationed.

12

42.    While the grossly unsanitary, overcrowded, and unsafe conditions of PTS transport vehicles create a significant risk of injury to any person in the PTS Defendants' custody, persons with disabilities or who suffer from medical conditions are particularly vulnerable.  As a matter of practice and custom, the PTS Defendants do not provide for the medical needs of persons in their custody, despite their constitutional obligation to do so.

43.    The PTS Defendants place their bottom line above all else, resulting in the grossly unsanitary and unsafe conditions on board PTS transport vehicles. But the problems do not end there; in the name of "keeping order," PTS employees mock, abuse, verbally and physically assault passengers who stand up for their basic human rights and speak out against the conditions on board. These employees often indiscriminately use pepper spray / mace to silence such individuals.

44.    On information and belief, the PTS Defendants fail to appropriately screen at hire, train and/or supervise their drivers and employees, to ensure that such abuses do not occur. In fact, the PTS Defendants' policies and practices engender a culture that encourages such conduct.

45.    Unsurprisingly, because the PTS Defendants conduct their business in the manner that they do, numerous people have been significantly injured, or in some cases have died, because they were assaulted and/or did not receive basic medical care while in PTS' custody.

46.    The PTS Defendants have been the subject of numerous lawsuits, investigations, and other complaints regarding its abuses and unsafe and inhumane conditions of transport. These lawsuits, investigations, and complaints include, but are not limited to, the following:

- A July 2016 report by the Marshall Project, a non-profit, national news organization that covers the criminal justice system, in conjunction with The New York Times, summarizing the results of an in-depth investigation into abuses within the private prisoner transport industry; the report focused in large part on the PTS Defendants.[1]

---

[1] Eli Hager & Alysia Santo, *Inside the Deadly World of Private Prisoner Transport*, The Marshall Project, July 8, 2016, https://www.themarshallproject.org/2016/07/06/inside-the-deadly-world-of-private-prisoner-transport (last visited July 9, 2019).

- An investigation by former Attorney General Loretta Lynch into a pattern of deaths, neglect, escapes and accidents in the prison transport industry, with particular focus on the country's largest extradition company, the PTS Defendants.[2]

- A lawsuit filed June 26, 2014, on behalf of a prisoner who died during transport on a PTS van; the complaint alleged that during transport, the plaintiff was assaulted by PTS employees and other inmates and that—although he continually requested treatment for preexisting medical conditions and injuries sustained in the assault—PTS failed to provide him any medical treatment. No. 4:13-cv-00288 (N.D. Ga.).

- A lawsuit filed May 29, 2015, by a plaintiff extradited from Florida to Pennsylvania by Defendant PTSA because he failed to pay a $250 probation-completion fee. PTSA agents allegedly demanded the plaintiff's watch in exchange for a pleasant journey; deprived him of regular food, water, and bathroom stops; and urinated on him. No. 3:15-cv-01061 (M.D. Pa.)

- A lawsuit filed March 14, 2016, in which the plaintiff alleged that—during his 11 day transport, PTS employees subjected him to physical and psychological abuses, including arbitrarily spraying his face with mace and refusing to allow him to rinse off for 40 hours, resulting in extreme burning pain and long-term damage. No. 1:16-cv-00018 (D. Colo.).

- A lawsuit filed August 29, 2016, in which the plaintiff (proceeding *pro se*) alleged that—while being transported from Los Angeles County Jail to **Cuyahoga County Jail**—he and other detainees were forced to endure 100-degree temperatures in a PTS/PTSA transport van without A/C, denied the opportunity to lay down for three days and three nights, required to urinate, defecate, and vomit into plastic bags, and denied much-needed medical treatment. No. 1:16-cv-2160 (N.D. Ohio).

- A lawsuit filed September 26, 2016, in which the plaintiff alleged that he spent nine days in PTS custody in "horrific" insanitary conditions that deprived transportees of sleep, food, and water, and that the PTS drivers/guards would "indiscriminately pepper spray the entire rear compartment" when one or two detainees acted up. No. 8:16-cv-03261-GJH (D. Md.).

- A lawsuit filed June 8, 2017, in which the plaintiff alleged he was forced to travel for 12 days in a PTS van without air conditioning during a summer of nationwide record heat; as a result, he suffered from nausea, dehydration, hyperthermia, and symptoms of heat stroke. The plaintiff further alleged that transportees' water was purposefully rationed to extreme levels to limit the number of stops for bathroom breaks. No. 4:17-cv-01733 (S.D. Tex.).

---

[2] Eli Hager, *U.S. Attorney General Loretta Lynch Will Probe Private Transport Industry*, the Marshall Project, July 12, 2016, https://www.themarshallproject.org/2016/07/12/u-s-attorney-general-loretta-lynch-will-probe-private-prisoner-transport-industry (last visited July 9, 2019).

- A lawsuit filed September 29, 2017, in which the plaintiff, who was pregnant at the time of transport, alleged that she spent 70 hours in a PTS van along a circuitous route, although her destination was a mere 100 miles away. The plaintiff became overheated in the unairconditioned van, was deprived adequate water and access to her prescribed prenatal vitamins and suffered a miscarriage after PTS employees ignored her reports of vaginal bleeding. No. 1:17-cv-00655-TSB (S.D. Ohio).

- A lawsuit filed October 2, 2017, in which the class action plaintiff alleged he spent 52 continuous hours in an unairconditioned PTS van during conditions in excess of 90 degrees and intentionally deprived of adequate water, and completely deprived of sleep. No. 0:15-cv-61902 (S.D. Fla.).

- A lawsuit filed April 4, 2018, in which the plaintiff alleged that she spent five days caged, and in tight restraints in a PTS transport van, covered in her own blood, urine and fecal matter. The plaintiff further alleged she was forced to urinate and defecate into bags, exposing herself to male passengers. No. 2:18-cv-00149-DBH (D. Me).

- A lawsuit filed April 24, 2018, in which the plaintiff alleged that he spent 18 days in a PTS transport van while being subjected to insanitary conditions and denied his medication for hypertension, thereby ignoring the risk that he would suffer a stroke, heart attack, kidney failure, and death. No. 5:18-cv-00070 (D. W.Va.).

## ACTIONS/OMISSIONS BY CUYAHOGA COUNTY

47.     Upon information and belief, Cuyahoga County Jail in Cleveland, Ohio has utilized the PTS Defendants' extradition and transport services since 2007 and continues to utilize those services to this day. Cuyahoga County officials were aware of the various lawsuits, investigations, and complaints regarding the grossly unsanitary conditions and other civil rights violations by the PTS Defendants but continued to use these services, ignoring the risk to the health and welfare of those detainees/inmates being transported to Cuyahoga County Jail.

48.     Upon information and belief, other Ohio counties, as well as municipalities in other jurisdictions, refuse to contract with the PTS Defendants because of their well-known reputation for moving prisoners in tortious conditions.

49.     Cuyahoga County is currently the subject of an official investigation into conditions and operations at the Cuyahoga County Jail after eight inmates died in custody in 2018. Cuyahoga

15

County Jail has made headlines due to these inmate deaths, severe overcrowding, and "deplorable" conditions of confinement.[3] These reports of the human and civil rights abuses within the County's jails further demonstrates the County's deliberate indifference to the rights of its detainees/inmates and speaks to its motivations and/or blatant carelessness in contracting with the PTS Defendants.

## U.S. CONSTITUTION CLAIMS

### COUNT I
### Civil Rights Violation – 42 U.S.C. § 1983; Cruel and Unusual Punishment
*Against the PTS Defendants and Cuyahoga County, Ohio*

50.     Plaintiff adopts paragraphs 1 through 49 as fully set forth herein.

51.     At all relevant times, the PTS Defendants, through their agents and/or employees, were transporting pretrial detainees and prisoners across state lines, a traditionally-governmental function, and acting under color of state law.

52.     Without their contract with Cuyahoga County that authorized them to transport Mr. Williams to Ohio and that delated the County's governmental authority, the PTS Defendants never would have exercised custody over Mr. Williams.

53.     At all relevant times, Mr. Williams was protected under the Fourth and Fourteenth Amendments to the U.S. Constitution from cruel and unusual punishment, use of excessive force, or punishment without the due process of law.

---

[3] *See*, *e.g.*, Cleveland.com, *U.S. Marshals Report: Cuyahoga County Deprives Inmates of Food, Water, and Constitutional Rights Amid String of Seven Deaths*, https://expo.cleveland.com/news/erry-2018/11/9b3d3f3cc89150/us-marshals-cuyahoga-county-de.html (Nov. 21, 2018); Cleveland 19 News, *Violence, Mold and Stenches: Former Inmate Describes 265 Days in Cuyahoga County Jail* (January 15, 2019), http://www.cleveland19.com/2019/01/15/violence-mold-stenches-former-inmate-describes-days-cuyahoga-county-jail/; Fox 8 Cleveland News, *Exclusive Video Inside Cuyahoga County Jail* (January 11, 2019), https://fox8.com/2019/01/11/i-team-exclusive-video-inside-cuyahoga-county-jail/; Cleveland.com, *Eighth Cuyahoga County Jail Inmate Dies* (January 1, 2019), https://www.cleveland.com/metro/2018/12/eighth-cuyahoga-county-jail-inmate-dies.html.

54. For a course of four days, the PTS Defendants deprived Mr. Williams of necessities for basic hygiene and adequate medical care, most notably after he was pepper sprayed in the face for doing nothing more than speaking out against the conditions onboard. Moreover, Williams was tightly—and excessively—restrained for 89 hours; for days he was forced to sit upright with ankles and wrists that became painfully chaffed, swollen, and discolored. He was given insufficient food and water and forced spend days in conditions that do not allow for adequate sleep. All passengers aboard the bus risked injury and death as they were not provided seatbelts and drivers often drove recklessly and at dangerous speeds.

55. Sitting only a few feet away, Defendant Guerra and the other individuals employed by the PTS Defendants were acutely aware of Williams's harsh conditions of transport. The PTS drivers/guards not only ignored Williams's plight—and that of his fellow passengers—they cruelly assaulted Williams by pepper spraying him in the face and forcing him to "sit in it" for days.

56. Mr. Williams treatment was not unexpected by the PTS Defendants. As the largest prison transport company in the nation, the PTS Defendants treat countless prisoners like they did Williams. The PTS Defendants routinely create inhumane conditions for transportees because they provide only inadequate training and their policies/customs encourage mistreatment of prisoners.

57. Driven by profits—and to meet deadlines—the PTS Defendants require that their drivers travel extremely long distances at high speeds without stopping. Further, they only contract with a handful of jails along a given route to house transportees overnight. Upon information and belief, the PTS Defendants encourage drivers to push harder without stopping, drive through the night and divert from their scheduled routes to pick up new passengers—all to increase profits. As a result, traveling for entire days without stopping is a standard operating protocol.

17

58.     The lack of sufficient food, water, medical care, and failure to accommodate basic human needs—like the shortage of stops—is similarly driven by the PTS Defendants' policies. The PTS Defendants allow their drivers only a food-and-beverage budget of a few dollars for each transportee each day. PTS/USPT employees are also instructed not to provide medical care unless a passenger is suffering from a "life or death" situation.[4] Yet, these employees are not sufficiently trained, and thus not qualified, to ascertain which medical conditions qualify as "life or death," and this policy ignores conditions that may cause substantial pain and suffering if not treated.

59.     Furthermore, upon information and belief, the PTS Defendants routinely encourage the use of threats, excessive restraints, and the unreasonable use of force to ensure that transportees who complain about unsafe and inhumane conditions are silenced, and those who request medical treatment are forced to withdraw their request. *See*, *e.g.*, No. 5:18-cv-00070 (D. W. Va.) (complaint filed Apr. 4, 2018) (alleging that PTS/USPT employees told other passengers that attending to the plaintiff's medical needs would cause further delays, causing those passengers to threaten plaintiff with bodily harm if he continued to insist on going to the hospital); No. 8:16-cv-03261 (amended complaint filed July 26, 2018) (alleging that PTS employees indiscriminately sprayed pepper spray into the entire rear of the transport van to control a few unruly detainees).

60.     The PTS Defendants' lack of training and profit-driven policies cause widespread constitutional violations. Since 2007, numerous prisoners have died in PTS/USPT custody because of similar conduct by their employees and/or agents. These abuses have been widely publicized in various news reports, official investigations, and lawsuits. Yet the PTS Defendants have done little or nothing to revise their unconstitutional practices, and Defendant Cuyahoga County continued to utilize the PTS Defendants' extradition and transport services despite the fact that it was aware,

---

[4] Hager & Santo, *supra* note 1.

or should have been aware, of these abuses. Upon information and belief, Cuyahoga County also directly received inmate complaints regarding the conditions aboard PTS transport vehicles.

61.     Interstate prisoner transport poses significant risks to the public and the transported prisoners.  Cuyahoga County delegated this public function to a loosely regulated private company because of the significant cost savings.  Cuyahoga County's outsourced this function while failing to take steps to ensure the safety of the public or its own prisoners. Instead of choosing a company that would have respected Williams' civil rights and not assaulted him—or instead of having him transported by Cuyahoga County personnel—Cuyahoga County chose PTS/USPT because their services were cheap. Had Cuyahoga County not contracted with PTS/USPT, Mr. Williams would not have been abused and assaulted by the PTS Defendants.

62.     Cuyahoga County failed to supervise or monitor their operations and treatment of prisoners—including Williams and countless other prisoners travelling to the County. The County similarly failed to establish any sort of policy or procedure for the PTS Defendants to follow in transporting Cuyahoga County prisoners, train the PTS Defendants, or review their operations.

63.     Because of the PTS Defendants' well-known and frequent violations of prisoners' constitutional rights and abuse of prisoners—and, upon information and belief, direct reports to the County—the need for a policy or sufficient training was obvious. In failing to take any action— first to vet the PTS Defendants prior to hiring, and later to train or supervise—Cuyahoga County expressed a deliberate indifference for Williams and his constitutional rights. The PTS Defendants were themselves aware of the need for adequate training of its drivers/guards, based on these prior lawsuits / complaints, yet did nothing. Defendants knew or should have known that transporting Williams in these conditions posed a substantial risk of harm to his health and safety, yet they intentionally or recklessly disregarded that obvious risk.

19

64. The deprivations of Williams' rights described herein are not reasonably related to the furtherance of any legitimate interest of security or any other legitimate interest, and instead were motivated by profit for the PTS Defendants, and cost-savings for Cuyahoga County.

65. Because of the PTS Defendants' willful failure to provide its passengers with safe and humane conditions of transport, and its encouragement of a corporate culture that condones abuse and assault, and because of Cuyahoga County's failure to vet, supervise, or train the PTS Defendants, these Defendants caused Williams to suffer significant physical and emotional harm.

66. The actions of the PTS Defendants and Cuyahoga County were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

67. **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against the PTS Defendants and Cuyahoga County and award actual and punitive damages in the amount of five million seven hundred thirty five thousand dollars and no cents ($5,735,000.00), costs, interest, attorney fees, and any other relief the Court deems just and equitable.

**COUNT II**
**Civil Rights Violation – 42 U.S.C. § 1983; Excessive Force**
*Against Defendant Guerra*

68. Plaintiff adopts paragraphs 1 through 67 as fully set forth herein.

69. At all times material hereto, Williams had the constitutional right under the Fourth and Fourteenth Amendments to be free from the use of excessive force.

70. At all times material hereto, Defendant Michael Guerra was acting under color of law by virtue of his employment with the PTS Defendants and in accordance with the authority delated by Cuyahoga County via contract.

20

71. Defendant Michael Guerra's actions in gratuitously pepper-spraying Mr. Williams, then forcing him to "sit in it" for two days was objectively unreasonable under the circumstances. Mr. Williams posed no threat to Defendant Guerra, the other PTS guards/drivers and/or the other passengers. Williams was handcuffed and shackled at the time and he was not overly disruptive in objecting to the unsafe and inhumane conditions onboard the PTS transport bus.

72. Defendant Guerra's conduct, including the deprivation of Williams' constitutional rights, represents not a single, isolated, accidental, or peculiar event, but occurred as a matter of regular procedure followed by employees of the PTS Defendants, with the company's knowledge and explicit or implicit encouragement.

73. It was clearly established at the time of Williams' transport that inflicting gratuitous injury and pain—such as through the use of pepper-spray—on a restrained inmate, whom did not pose a threat, constituted excessive force.

74. As a result of the use of excessive force by Defendant Guerra, Williams suffered and underwent great physical pain, with lasting emotional and psychological harm.

75. The actions of Defendant Guerra were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

76. **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against Defendant Guerra and award actual and punitive damages in the amount of five million seven hundred thirty five thousand dollars and no cents ($5,735,000.00), costs, interest, attorney fees, and any other relief the Court deems just and equitable.

## STATE LAW CLAIMS

### COUNT III
### ASSAULT AND BATTERY
*Against Defendant Michael Guerra*

21

77.     Plaintiff adopts paragraphs 1 through 76 as fully set forth herein.

78.     Defendant "Sergeant" Guerra committed assault and battery when he threatened to shoot Mr. Williams in the head, and later when Guerra gratuitously pepper-sprayed Williams and forced him to "sit in it" for two days. Guerra was not privileged to use such force because Williams was restrained, posed no threat to anyone, and was merely objecting to the inhumane conditions aboard the PTS transport bus.

79.     As a result of the assault and battery upon his person by Guerra, Williams suffered and underwent great physical pain, with lasting emotional and psychological harm.

80.     The actions of Defendant Guerra were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

81.     **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against Defendant Guerra and award actual and punitive damages in the amount of three million one hundred thousand dollars and no cents ($3,100,000.00) costs, interest, attorney fees, and any other relief the Court deems just and equitable.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *Against Defendant Michael Guerra and the PTS Defendants*

82.     Plaintiff adopts paragraphs 1 through 49 as fully set forth herein.

83.     The PTS Defendants, through their agents/employees, knew or should have known that the acts or omissions described above and their lack of concern and their demeaning, inhumane conduct and conditions of transport would shock and outrage a person of ordinary sensibilities.

84.     The PTS Defendants had a duty, through their agents/employees, to refrain from inflicting such cruel and unusual punishment as described above upon Mr. Williams.

85. The PTS Defendants breached that duty through a series of acts and omissions that were designed to break the spirit and the will of its detainee/inmate passengers, such as Williams.

86. Williams' injuries were a foreseeable result of the conduct of the PTS Defendants, in that he repeatedly expressed his fears and concerns regarding the inhuman conditions during the transport, and while being forced to "sit in it" after being pepper-sprayed.

87. As a direct and proximate result of the intentional acts and/or omissions of these Defendants, Mr. Williams suffered great physical pain and emotional harm.

88. The actions of the PTS Defendants were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

89. **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against the PTS Defendants and award actual and punitive damages in the amount of three million one hundred thousand dollars and no cents ($3,100,000.00), costs, interest, attorney fees, and any other relief the Court deems just and equitable.

### COUNT V
### VICARIOUS LIABILITY
*Against the PTS Defendants*

90. Plaintiff adopts paragraphs 1 through 89 as fully set forth herein.

91. To perform pursuant to their contract with Cuyahoga County, the PTS Defendants employed Defendant Michael Guerra and the other guards/drivers onboard to transport Williams from Omaha, Nebraska to Cleveland, Ohio.

92. The wrongful acts of Defendant Guerra and the other guards/drivers occurred while they were operating a vehicle owned by the PTS Defendants and while transporting Williams at their direction. The PTS Defendants' control over their employees includes: (a) controlling their schedules and routes; (b) facilitating communication between drivers and detention facilities where

23

PTS transport vans and busses stop, or transfer prisoners; (c) directly instructing drivers to pick up passengers at certain times and locations; (e) supervising drivers directly; (f) controlling what passengers can eat/drink, and when they can stop for bathroom breaks, to stretch their legs, sleep, or medical care. Furthermore, a PTS supervisor, Ms. Slade, was informed of Williams' complaint regarding the inhumane conditions aboard the bus but did nothing to prevent further abuses.

93.     Defendant Guerra and the other guards/drivers were acting within the scope of their employment when they neglected, abused, and assaulted Mr. Williams. Defendant Guerra and the others drove through the night, forcing Williams and the other passengers to stay onboard—tightly shackled and cuffed, sitting upright through the night—for days on end, to meet schedule demands and in furtherance of the PTS Defendants' bottom line. Mr. Williams and the others were placed into excessively tight restraints in accordance with the PTS Defendants' policies and/or customs. Finally, Williams was assaulted (via pepper spray) to quiet his complaints regarding the conditions onboard and denied much-needed medical care in order to keep on-schedule.

94.     Williams' injuries were foreseeable by the PTS Defendants who are acutely aware of their drivers' typical conduct and the conditions in their prison vans.

95.     The actions of the PTS Defendants were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

96.     **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against the PTS Defendants and award actual and punitive damages in the amount of ten million dollars and no cents ($10,000,000.00), costs, interest, attorney fees, and any other relief the Court deems just and equitable.

## COUNT VI
## NEGLIGENCE / GROSS NEGLIGENCE
*Against the PTS Defendants*

97.     Plaintiff adopts paragraphs 1 through 96 as fully set forth herein.

98.     On or about July 15, 2018, Mr. Williams was a passenger in a vehicle driven by the PTS Defendants.

99.     As transporters for hire, the PTS Defendants owed their passenger a duty to exercise reasonable and ordinary care in providing safe transport and humane conditions, to avoid causing passengers unnecessary harm, and to arrange for treating a prisoner's medical needs should they arise during transport.

100.    Defendant Guerra was an employee and/or agent of the PTS Defendants and, at all relevant times, under their control. During the trip from Omaha to Cleveland, the PTS Defendants controlled Defendant Guerra's and the other drivers' schedule, route, frequency of their stops, and their conduct towards passengers, including Mr. Williams.

101.    The PTS Defendants breached their duties as common carriers in allowing Guerra and the other drivers to assault Williams while he was under their protection and deny him much-needed medical care, and in providing unsafe and inhumane conditions of transport. The PTS Defendants negligently and carelessly confined Williams for many hours at a time with an inability to move, stretch, or use they restroom; they also negligently and carelessly failed to provide him with sufficient food and water, or conditions allowing for adequate sleep. PTS and its employees also negligently failed to operate the bus in a safe manner and provide seatbelts. These Defendants actions and omissions were unreasonable, or in reckless disregard for the rights of their passengers.

102.    As a result of the PTS Defendants' breach and failure to provide safe passage, Mr. Williams suffered, and continues to suffer, serious harm.

103.    The actions of the PTS Defendants were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

104.     **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against the PTS Defendants and award actual and punitive damages in the amount of ten million dollars and no cents ($10,000,000.00), costs, interest, attorney fees, and any other relief the Court deems just and equitable.

**COUNT VII**
**NEGLIGENT SUPERVISION AND HIRING**
*Against the PTS Defendants and Cuyahoga County*

105.     Plaintiff adopts paragraphs 1 through 104 as fully set forth herein.

106.     The PTS Defendants had a duty to prevent their employees from causing detainees/ inmates harm during transport. The PTS Defendants knew, or should have known, that its drivers were transporting prisoners in a manner as to cause them significant harm.

107.     Cuyahoga County, Ohio owes a duty to care to prisoners being transported to the County Jail; this includes a duty to hire a prison transport company that will transport its prisoners safely and under humane conditions. Cuyahoga County knew, or should have known, that the PTS Defendants were likely harm Mr. Williams and other inter-state transportees.

108.     Upon information and belief, the PTS Defendants failed to adequately screen their drivers prior to hire and/or failed to adequately supervise, train, or monitor their drivers. The PTS Defendants also failed to adequately train, supervise, and retain their employees so as to ensure the safety and reasonable care of the prisoners over which they would have control. Defendants' employees received grossly inadequate training, and the PTS Defendants' policies and procedures were designed in a way that was likely to cause harm to persons in the custody and control of their employees. Given the lawsuits filed against the PTS Defendants—including lawsuits for wrongful death and serious injuries—these Defendants knew or should have known of the common practices of their employees, including failing to provide detainees with adequate stops to use the restroom,

driving vehicles at excessive speeds, assaulting detainees and failing to provide medical attention. Upon information and belief, despite this knowledge, the PTS Defendants failed to train, supervise, and continued to retain employees such as Defendant Guerra whom used abusive and dangerous practices. The PTS Defendants breached their duty to retain competent employees.

109.    Upon information and belief, and as described in more detail above, Cuyahoga County failed to adequately investigate or vet the PTS Defendants prior to their hire.

110.    As a result of the County's and the PTS Defendants' negligence, Mr. Williams has suffered, and continues to suffer, significant harm.

111.    The actions of the PTS Defendants and Cuyahoga County were so outrageous as to be intolerable in a civil society, thereby justifying an award of punitive damages in this case.

112.    **WHEREFORE**, Plaintiff Franklyn Williams respectfully requests that the Court enter Judgment against the PTS Defendants and Cuyahoga County and award actual and punitive damages in the amount of ten million dollars and no cents ($10,000,000.00), costs, interest, attorney fees, and any other relief the Court deems just and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury on all issues triable as of right by a jury.

**RESPECTFULLY SUBMITTED**, this the 13th day of **July**, 2019.

THE BOWLIN LAW FIRM P.C.

BY: _____
Troy L. Bowlin, II, BPR No. 025893
Attorney for Franklyn Williams
FIRST TENNESSEE PLAZA
800 South Gay St. Suite 2131
Knoxville, Tennessee 37929
troy@tblf-pc.com
www.thebowlinlawfirm.com

27